602     APPELLATE COURTS OF ILLINOIS.

Kestin v. Northwestern Elevated R. R. Co., 160 Ill. App. 602.

## Joseph Kestin, Administrator, Appellee, v. Northwestern Elevated Railroad Company, Appellant.

### Gen. No. 15,429.

VERDICTS—*when set aside with finding of facts.* Notwithstanding the trial court is required to submit a cause to the jury where there is some evidence to support the plaintiff's declaration, yet the Appellate Court is not bound by the same rule and it should if it finds the verdict not supported by the evidence render a judgment of reversal with a finding of facts. Borg v. C. R. I. & P. Ry. Co., 162 Ill. 348, followed.

Action in case for death caused by alleged wrongful act. Appeal from the Superior Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1909. Reversed with finding of fact. Opinion filed April 7, 1911.

**Statement by the Court.** On May 31, 1907, Morris Manhoff was killed upon the tracks of the Northwestern Elevated Railroad Company in the city of Chicago. Suit was brought by Joseph Kestin, administrator of his estate, hereinafter called the plaintiff, against the Railroad Company, hereinafter called the defendant, seeking to hold the defendant for damages under the statute.

The declaration originally consisted of six counts, all of which have been abandoned except the fifth.

The alleged negligence upon which the liability of the defendant is predicated, is that the defendant allowed a certain portion of a plank in the walk which plaintiff's intestate was required to use in the discharge of his duties to become and remain defective and broken, and that plaintiff's intestate necessarily and unavoidably tripped, stumbled and fell upon, against and over said defective and broken plank, and his body then and there and as a result thereof was thrown upon and across the tracks of the defendant, and defendant's

train of motor cars ran against plaintiff's intestate, causing his death.

Manhoff was a towerman employed in what was known as the Montrose tower house on the defendant's railroad, the north terminal of which railroad was at Wilson avenue, about one block north of Montrose boulevard.

Fred Rahling, a witness for the plaintiff, testified that he knew the decedent and had worked with him about a year and a half on the defendant's railroad; that the only buildings at Wilson avenue consisted of the station and a dispatcher's office, where the guards, switchmen and other men reported to take out their trains; that the dispatcher's office was at the south end of the platform; that at Wilson avenue the tracks of the elevated railroad came down to the street level; that there were two inclines, one on the east and one on the west. On the east incline there were two tracks at the time of the accident, May 31, 1907, and a board walk was between the tracks; that the walk was about three feet wide and of common boards about one inch thick and two inches apart, the boards being laid lengthwise and resting on two-by-fours; that the walk led towards the office, which is at the foot of the incline, just at the south end of the platform; that there is a space between the north end of this walk and the station platform, in which there are no boards but simply ties. On the night of the accident the witness, who was a guard, said he had just come in with his train, at about 8:05, when he was informed of the accident by Ast, who was a switchman for the company, and his assistance requested by Ast; that he went over to the platform or walking-way where Manhoff had been run over; that there was a cross-over switch near the foot of the incline, and a one-arm semaphore and signal; that it was between the semaphore and the cross-over that he and the others picked up Manhoff—south of the cross-over and north of the semaphore; that the tracks of the elevated railroad are about twenty or

604    APPELLATE COURTS OF ILLINOIS.

Kestin v. Northwestern Elevated R. R. Co., 160 Ill. App. 602.

twenty-two feet above the ground before the incline begins, and that just before reaching Wilson avenue they go down to the ground; that in going to where he found Manhoff he had to walk on the ties, there being "no boards at all up to that point;" that when he reached Manhoff, Cagwin, another switchman, was there, and no one else. Ast afterwards came up. Manhoff's legs were between the ties, between the running rail and the third rail; that it was about 75 feet from the south end of the station platform to the point where he found Manhoff.

Frederick Muhlberger, a police officer, testified that he arrived at the scene about 8:30 or 8:35, and helped carry the man's remains across the street to an undertaking room.

Samuel J. Bloomenthal, a stenographer who knew Manhoff in his lifetime, testified that the day after the accident, just before the inquest was held, he went to the place where he understood the accident happened; that he went under the structure between the cross-over and the semaphore; that the bottom part of the structure was a couple of feet above his head; that he and the others with him found a pool of blood underneath the place, and almost directly over it and a little off to the east there was a broken plank; that he did not go on top of the structure.

Dr. Budan, after testifying to the condition in which he found the body on the night of the accident, testified that on the next day he went with Bloomenthal and others under the incline; that the hole was somewhere between the cross-over and the target light, perhaps five or six feet north of the target light; that he thought the hole was in the second board; that it looked as if it was formed in a rotten board and that there were small pieces of wood hanging down; that the hole was perhaps three or four inches wide at the widest point and about an inch or two wide at its narrowest point. This witness did not go on top of the structure. On cross-examination he said: "The ties were between

four and eight inches apart, and the hole was between the ties as we looked from below, and pieces of wood were hanging down under it."

Joseph Kestin also testified that he examined the place with others on the day after the accident, but did not go on top of the structure; that the hole was in the first or second board from the west, and was about four inches wide at its widest point; that he could not recollect the shape of it; that it was an old, rotten board. On cross-examination he says: "This break was about the middle of the board between its two ends, running north and south. The board was broken right down there in the middle. The hole was not at the end of the board. The hole was probably eight or ten feet north of the track;" that he looked only from the bottom.

Jacob Lurie testified that he went with Kestin, Doctor Budan and Bloomenthal to the place where the accident is said to have occurred, and went under the structure; that he saw a board broken "right through the structure;" that there were four boards, and the broken one was the first or second from the west; that it was in the middle of the board, and that the edges of the board were irregular.

Marcus Budan, a witness for the plaintiff, testified that he also went underneath the structure the day after the accident; that he saw the plank, which seemed to be rotten, broken and drooping down; that this plank was about fifteen or eighteen feet north of the target light; that the piece that was broken was dropped down and was two or three feet long. The plank was ten inches wide; there was blood on it.

Nathan Kestin testified for the plaintiff that he had been working for the Elevated Railroad for about one year before Manhoff was killed; that the walk was used by all of the employes constantly, day and night; that he himself had been over the walk before that day, and knew its condition in the neighborhood of the crossover and semaphore; that there had been some places

606    APPELLATE COURTS OF ILLINOIS.

Kestin v. Northwestern Elevated R. R. Co., 160 Ill. App. 602.

where the boards had been broken out; that a board was broken out six or eight feet south of the target; that it was of triangular shape, about one foot and one-half long and six or seven inches wide. On cross-examination he testified that he was a brother of the administrator and a cousin of the deceased; that "it was a rotten old lot of boards running up there and full of holes. Some of them had holes. Most of them had holes. There were three or four holes between this cross-over and the semaphore. The biggest one was about a foot and a half long and six inches wide. This big hole was there in the first or second board from the west. The next biggest hole was around that place on the third or fourth board from the west. I could not tell exactly where the third hole was, but they were along the four boards. Some of them were broken out, I could not tell exactly. I could not remember where the fourth hole was. I had noticed all these various holes, and these rotten boards before this happened. Noticed them all the time I had been there, and I continued to walk up there all the time. I was going there as a switchman and going to the office. When I reached these holes I would be careful not to fall in, and I looked out for these holes to see that I did not get hurt. The public did not go up that place. Manhoff was working as towerman that night." He further testified that he had known the boards there were dangerous for more than a year; that Manhoff had worked there for about two years, and was obliged to cross over all those different holes and rotten planks; that a man could reach the towerhouse by going to Montrose boulevard and up a stairway, but it would take about five minutes—twice as long as to go by the incline. Witness was shown a photograph taken one or two days after the accident, and stated that it correctly showed the situation, excepting that it did not show the holes in the boards.

Jake Friedman, a witness for the plaintiff, testified that he was at Manhoff's house on Sheffield avenue

about eight or half past eight; that a policeman came there and told him of the accident; that he got on a train and went to Wilson avenue, reaching there between half past eight and nine; that he went to the place of the accident and that Manhoff's right leg was lying in the hole; that the hole was between the first and second boards; that his head was south on the track and his feet north; that witness recognized Manhoff, and with others tried to pick him up, and that thereupon he, the witness, fainted. On cross-examination he testified that when he fainted he was south of the target light and north of the cross-over; that he went there alone.

On behalf of the defendant, William H. Shapaker testified that he was assistant claim agent for the Elevated Company on May 31, 1907; that he with Cagwin and Ast went to the place where the accident occurred between 8:30 and 8:35 in the evening and made an examination of the place; that he prepared the photographs offered in evidence, one representing the scene looking north and the other representing the scene looking south; that he noticed that the corner was knocked off the east plank of the walk at the north end of the plank; and that it was in that condition on the evening of May 31st; that there were no other holes in the walk on the evening of May 31st nor the day following; that he saw Friedman, one of the witnesses for plaintiff, about ten o'clock; that Friedman was on the platform for a time, and came into the room known as the trainmen's waiting room, and was in there with three ladies and one other man, and while there he fainted; that the body of Manhoff was not on the structure at that time; that it had been taken away an hour and a half or two hours before.

Bruno B. Schrager testified that he was a civil engineer employed by the railroad. The witness identified a plat which he made, and stated that it correctly represented the structure with the ties and plank and third rail exactly at the time that he took the measurements,

which was during the first half of June after the accident; that at that time there were three planks east of the place identified as the place of the accident, and one was broken off exactly as shown in the plat.

Raymond S. Zeitler, a witness for defendant, stated on the morning of June 1, 1907, about eleven o'clock he examined the incline and made a plat drawn to a scale, showing the blood spots as he found them; that he made an examination of the structure all around there and noted the corner off the end of the extreme east plank; that there were no other holes on the walk at any place at that time; that that was the only plank that was broken; that there were no holes in the second plank and it was not broken.

Walter Baynes, a police officer, testified for the defendant that he went to notify the wife of Manhoff, at about ten o'clock at night after the accident, and met two men, one of whom probably was Friedman.

Jacob Pfeifer, a switchman for the defendant, testified that he learned of the accident at about 8:30 that night, but did not go down to the place where it had occurred; that he had been working at the station about three weeks, and had been up and down the incline every night three or four times; that he did not notice any holes in the sidewalk with the exception of the corner broken off at the end of the east plank at the north end of the walk; and that it appeared to him like a sound walk.

Frank Artman, a motorman, testified for the defendant that he had been working around Wilson avenue terminal for about five years before the time of the accident; that during the time he worked there the plank walk was laid down between the tracks on the incline; that he went over it probably once or twice a week; that he did not remember seeing any holes in the walk between the semaphore and the north end of the planks, with the exception of the corner that was broken off of the east board; that it seemed like a sound walk.

Otto E. Cagwin, motorman and hostler for the appellant, testified that he had occupied his position from May 18, 1907; that on the night of May 31st he was working in the upper yard north of the shop; that his attention was called to the accident, and he was the first man to reach the decedent; that the next person was Ast and the next was Elston, the dispatcher; that Manhoff was lying right across the third rail that branches off. On being shown the photograph, witness testified that it represented exactly the position of the incline where he found Manhoff. ''I saw him lying across the third rail, the trolley shoes follow to the cross-over, and then the rails are pointed; that allows the shoe to catch the rail going up the main line, it simply runs down to a point so the shoe will catch it. and that was stuck into the side of his body. The point was sticking into the right side of the body, his head to the east, his face down. His feet were west and down between the ties, between the running rail and the third rail, outside of the east running rail of the west track, and west of the third rail. There never was a night that I was in the yards there that I was not up and down those planks at least once. I had charge of the yards, and had been a switchman and motorman for about three years. With the exception of the corner of the east board, appearing in the photograph to be broken off, there was not any other hole from the beginning of this plank on this end here to the top of the hill. I never saw any other hole in any place in the walk. I walked up and down there constantly, and sometimes I run. The walk was in good condition.'' Witness testified further that he and Ast lifted Manhoff out from between the ties and placed him on a board; that he lay on the board until the police took him away not over twenty or twenty-five minutes afterwards; that he did not know Friedman, but he did not see any one faint at the place of the accident.

H. O. Ast, night hostler for appellant, substantially

610    Appellate Courts of Illinois.

Kestin v. Northwestern Elevated R. R. Co., 160 Ill. App. 602.

corroborated Cagwin's testimony about what was done with the body of the injured man, and that he saw Friedman on the incline, and that no one fainted on the incline any where near where the accident occurred. He testified: "There was not any hole in that plank that night. The hole where the north end of the east board was knocked off was the only hole north of the semaphore that night; that was the only plank that was broken. I had been up and down that incline before and had never noticed any other holes. It looked to me to be a pretty sound walk. I examined the cars that night."

Louis A. Elston, a witness for defendant, testified that he was the dispatcher; that he saw Friedman first between ten and eleven o'clock; that there were three ladies with him, one of whom was Mrs. Manhoff, the wife of the deceased; that Friedman and Nathan Kestin went across the street to the undertakers, and then returned to the waiting room. A few minutes after that Friedman fainted. When he fainted he was inside of the trainmen's waiting room; that witness had been located at Wilson avenue about six months before the accident, and had been up the incline; that it was in a perfectly safe condition; that there was no hole at any place between the semaphore and the north end of the walk, except the little broken corner of the north board shown in the photograph; that there were no holes south of the semaphore.

John H. Rahling, a platform man, states that he saw Friedman when he fainted; that he was in the trainmen's room, and that it was between half past ten and eleven; that he had seen him before that time, about nine o'clock, on the platform when he walked up to the dispatcher's office.

The usual motions were made at the close of plaintiff's case and again at the close of all the testimony, that the jury be instructed to find a verdict for the defendant, and exceptions were duly preserved to the rulings of the action of the court in overruling the

motions. A verdict in favor of the plaintiff was rendered and judgment entered thereon, after a motion for a new trial had been denied.

SHERIFF, DENT, DOBYNS & FREEMAN, for appellant; CLARENCE A. KNIGHT, of counsel.

FRANCIS X. BUSCH and FRANK A. ROCKHOLD, for appellee.

MR. JUSTICE CLARK delivered the opinion of the court.

In the foregoing statement we have given, in much more than ordinary detail, the testimony relating to the accident in this case, because the case itself turns, in our judgment, entirely upon a question of fact.

Errors are alleged upon the rulings of the court in the admission of testimony, as well as in the giving of certain instructions and the refusing to give certain others. We think, however, that the only one that needs to be considered is the one as to the ruling of the court in refusing to grant a new trial. As there was no eye witness to the accident, the testimony was necessarily wholly of a circumstantial character.

The only allegation in the declaration as finally amended, as to the alleged negligence of the defendant, was that it allowed a certain portion of the plank in the walk that plaintiff's intestate was required to use in the discharge of his duties to become and remain defective and broken, by reason of which the plaintiff's intestate was caused to stumble, and he thereupon was run into by a train of motor cars and killed.

Two photographs were introduced in evidence which were taken a day or two after the accident, and both are shown by the testimony to portray correctly the situation. One as taken from the north and one from the south. They show that the end of one of the boards was broken, but it was not claimed by plaintiff's counsel that it was because of this broken plank that the accident occurred. The photographs do not show any other holes in the planking.

612     APPELLATE COURTS OF ILLINOIS.

Kestin v. Northwestern Elevated R. R. Co., 160 Ill. App. 602.

As set forth in the foregoing statement, witnesses were placed on the stand by the plaintiff, most of whom testified that they examined the walk from below, and that there were numerous holes, etc. Two of the plaintiff's witnesses, namely Nathan Kestin and Jake Friedman, testified that they were on top of the structure. It is quite apparent that Friedman was not testifying to the truth. He was notified some time after the accident by a policeman, and could not have reached the station until after the body had been taken to the undertaker's. We are informed in the reply brief for the appellant that the trial judge made this statement to the attorneys for the parties at the hearing of the case:

"I do not think that Friedman told the truth. The only question is a question of policy. I think he committed perjury. I do not think that he was mistaken, but that he lied. I will call it to the attention of the state's attorney, and tell him what the facts are."

After a full examination of the record, we agree with the trial judge in his emphatic characterization of Friedman's testimony. He testified that he went to the place of the accident, and that Manhoff's right leg was lying in the hole, his head south, etc. This is the only direct testimony tending to show the negligence charged in the declaration. The other witnesses for the plaintiff, excepting Nathan Kestin, saw the place only from below.

It will be noticed that Marcus Budan, a witness for the plaintiff testified that he saw the plank, which seemed to be rotten, and it was broken and drooping down; that this plank was about fifteen or eighteen feet north of the target light. Joseph Kestin places the hole which he saw at eight or ten feet north of the track; Dr. Budan at five or six feet north of the target light. Nathan Kestin's testimony to the effect that there were several holes in the planking, and the planking itself had been in bad shape for more than a year, was contradicted by the testimony of several witnesses

for the defendant, some of whom had had occasion to use the walk many times, as set forth in the foregoing statement, and was disproved by the photographs, which showed no holes.

In order that the plaintiff be allowed to recover it would be necessary to indulge in the conjectures that the intestate had reached the walk when struck by the train and was not on the ties, which he had to pass over before reaching the walk; that there was a hole in the walk; that one of his feet went into this hole; that he fell in consequence thereof and was then struck by the cars. There is no satisfactory evidence that there was such a hole, and on the other hand there is much testimony in the record as to the place where the intestate was found, the condition of his clothing and shoes, the blood stains upon the car which probably struck him, etc., indicating that the accident happened in some other very different way.

Our conclusion is that the plaintiff did not prove by a preponderance of the evidence that the defendant was guilty of the negligence attributed to it in the declaration. Under the well known principle governing this action, as laid down by the Supreme Court, the trial court had no alternative but to submit the case to the jury because there was some evidence tending to support the contention of the plaintiff. This court, however, is not bound by the same rule. It is our duty, as we understand it, to end the litigation if, in our opinion, no judgment in favor of the plaintiff could, under the pleadings and evidence, properly be sustained. As that is our view of this case no good purpose would be subserved by remanding it to the Superior Court.

The judgment of the Superior Court will therefore be reversed, but the case will not be remanded to that court for further hearing.

*Reversed with finding of fact.*